An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-689
NO. COA13-692

NORTH CAROLINA COURT OF APPEALS

Filed: 1 April 2014

JOHANNA MARIA MAGDALENA MARSHALL,
LISA MULL MOORE, ROBERT CHRISTIAN
MOORE,
      Plaintiffs,

      v.                                    Mecklenburg County
                                            No. 10 CVD 24330
HUNTER DOUGLAS MARSHALL,
      Defendant.


      Appeal by Defendant from orders entered 20 August and 18 October 2012 by Judge Paige B. McThenia in Mecklenburg County District Court. Heard in the Court of Appeals 21 November 2013.


      *Jonathan McGirt for Plaintiff Marshall.*

      *No brief for Plaintiffs Moore.*

      *Marshall & Taylor, P.C., by Travis R. Taylor, for Defendant.*


      STEPHENS, Judge.


                    *Factual Background and Procedural History*

      This appeal arises from the self-described "desperate measures" undertaken by Defendant Hunter Douglas Marshall

("Defendant") in an attempt to prevent the end of his marriage to Plaintiff Johanna Maria Magdalena Marshall ("Johanna"), and, once the marriage did end, his campaign of hatred and harassment against Johanna and Johanna's family, friends, and acquaintances, as well as Plaintiffs Lisa Mull Moore and Robert Christian Moore ("the Moores"). Defendant and Johanna married in 1985 and had two children together: a daughter born in 1990 and a son born in 1995. In 2008, Johanna expressed to Defendant her interest in pursuing a romantic and sexual relationship with another woman. Hoping to preserve his marriage and family, Defendant initially agreed to his wife's desire. Johanna began a relationship with Plaintiff Lisa Mull Moore ("Lisa"), a woman who was then, and remains, married to Plaintiff Robert Christian Moore, who was also aware of and acquiesced in the relationship between Johanna and Lisa. Defendant not only knew of and permitted this relationship, but also expressed to Lisa his gratitude for making Johanna "happier than she had ever been." However, at some point during the first half of 2009, Defendant's view of the relationship between Johanna and Lisa changed, and he demanded that it end. When Johanna declined to sever ties with Lisa, Defendant began harassing his wife by phone, text, and email.

By April 2010, the Marshalls had separated. On 26 July 2010, they entered into a marital dissolution agreement ("MDA") in Tennessee.[1] The MDA included, *inter alia*, provisions which barred either party from harassing or interfering with the other and specifically prohibited Defendant from harassing "Lisa and Bob Moore in any way, [sic] no communication with their friends or known associates." The MDA also includes Defendant's relinquishment of "any rights he has regarding North Carolina laws of alienation of affection[] and/or criminal conversation which may have resulted from the past actions or which may result from the future actions" of the Moores. On 23 September 2010, the MDA was filed in the Chancery Court for Anderson County, Tennessee and became an order of the court.

After signing the MDA, however, Defendant continued his daily harassment of Johanna by phone, text, and email. Defendant also repeatedly contacted Johanna's elderly parents to disparage them and Johanna. He began sending emails and letters about the relationship between Johanna and Lisa to their extended families, friends, co-workers, minister, religious

---

[1] At the time the MDA was signed, it appears that Johanna was living near Charlotte, North Carolina. The record does not clearly indicate the parties' connection to Tennessee. In any event, the validity of the MDA has not been challenged prior to or in this appeal.

congregation, and various media entities. In October and November 2010, Defendant sent a packet of information about the women's relationship to the minister of the Moores' church, members of that congregation, and the Moores' son. The 22-page packet included copies of numerous explicit and private emails between Johanna and Lisa.

On 9 November 2010, Johanna's attorney sent Defendant a letter pointing out that his behavior was in violation of the MDA and that Johanna would file a motion that Defendant be held in contempt if Defendant did not cease his harassment immediately. Defendant replied "please sue me" and continued to send the packet to other parties, including Johanna's friends and relatives. On 16 November 2010, Defendant emailed a copy of the packet to a reporter at the Charlotte Observer and explained that he planned to begin picketing the Moores' church. Defendant told Johanna that he hoped to ruin the Moores' lives and wished that Bob Moore would end up shooting Lisa over the situation.

On 1 December 2010, Johanna filed a complaint and motion requesting the court to enter a domestic violence protection order ("DVPO") and Lisa filed a complaint requesting a no-contact order for stalking or nonconsensual sexual conduct

("NCO"). Following a hearing on 8 December 2010, the district court entered a one-year DVPO and an NCO against Defendant. The DVPO prohibited Defendant from committing "further acts of abuse" against Johanna or contacting her, "direct[ly] or indirect[ly], by means such as telephone, personal contact, email, pager," or fax machine. The NCO prohibited Defendant from, *inter alia*, abusing, stalking, harassing, or contacting Lisa and her family, and also specifically barred Defendant from contacting the congregation of the Moores' church, occupants of their neighborhood, and members of another community group with which Lisa was affiliated.

Following entry of the orders, Defendant moved for a new trial and to set aside the DVPO and also gave notice of intent to appeal from both orders. In response, Johanna and Lisa moved to dismiss Defendant's appeal and for sanctions. On 4 March 2011, the court denied Defendant's motions for new trial and to set aside the DVPO and also denied the plaintiffs' motions for sanctions. Defendant voluntarily dismissed his notices of appeal on 9 March 2011.

However, Defendant continued his campaign of harassment against Johanna and the Moores, seeking "more creative and indirect methods though which he [could] continue his

contemptuous behavior." For example, Defendant left numerous ranting voicemails for Johanna's parents in which he called Johanna's family "disgusting" and "scummy" people, expressed a wish that her elderly parents would "get sick and die," and threatened to cut off contact with his own son if the son visited Johanna or her parents. Defendant emailed his and Johanna's children and Johanna's father, describing Johanna's family as "disgusting" and "lazy" people who "brought devastation to the people and children around you."

On 27 April 2011, pursuant to N.C. Gen. Stat. § 52C-6-601, Johanna filed a notice of registration of a foreign support order for the MDA in the district court in Mecklenburg County. Defendant did not contest registration of the MDA, which was confirmed by operation of law as of 17 May 2011. *See* N.C. Gen. Stat. § 52C-6-606 (2013). On 2 September 2011, Johanna filed motions for contempt and for costs and fees, alleging that Defendant had breached the MDA by failing to make monthly structured payments, that he owed Johanna attorneys' fees she had incurred due to his noncompliance with the MDA, and that he was in contempt of the DVPO due to his harassment and threats toward Johanna and her family. On the same day, Lisa filed a

motion for costs and fees, and the Moores moved for joinder of their case with Johanna's.

On 24 October 2011, Johanna and Lisa moved for renewal of the DVPO and NCO, respectively. Both orders were renewed in December 2011 and again in May 2012. Johanna's and Lisa's motions for contempt and for costs and fees came on for hearing on 30 January, 12 April, and 13 April 2012. On 13 April 2012, the trial court heard closing arguments from the parties and then, prior to announcing her ruling, the judge recessed court for one hour for lunch. When court resumed, Defendant did not return. Instead, Defendant told the judge by telephone from the airport in Charlotte that he was not returning to court because he did not want to be arrested. The judge issued an order for Defendant's arrest and sent law enforcement officers to the airport to prevent Defendant from leaving for his home in California. Defendant's wallet was recovered from the airport, but his whereabouts remained unknown. The judge announced her ruling in open court that afternoon, finding Defendant in contempt of the MDA and DVPO. She awarded costs and fees to Johanna and Lisa. The judge, concerned that Defendant might not pay the costs and fees awarded to the plaintiffs, also suggested that the plaintiffs seek an injunction preventing Defendant

from, *inter alia*, accessing a Roth IRA account worth more than $3.5 million which had been awarded to Defendant pursuant to the MDA. *See* N.C. Gen. Stat. § 1A-1, Rule 65 (2013). Johanna did so, and, on 16 April 2012, the court entered a temporary restraining order preventing Defendant from accessing the Roth IRA. Johanna then moved for a preliminary injunction pursuant to Rule 65. Defendant did not appear at the hearing on that motion, which the court granted on 1 June 2012.

On 20 August 2012, the court entered its written order memorializing the ruling announced in open court at the conclusion of the hearing on 13 April 2012, granting Johanna's and Lisa's motions for sanctions, attorneys' fees, and costs and all of the plaintiffs' motions for contempt ("the August order"). The August order gave Defendant ten days to purge his contempt by (1) ceasing all contact with and harassment of the plaintiffs, their families, and their acquaintances and (2) paying to Johanna $130,830.05. From that order, Defendant appealed on 18 September 2012.

On 31 August 2012, Johanna filed another motion for contempt, alleging that Defendant had failed to comply with the August order. By order entered 18 October 2012 ("the October order"), the court held Defendant in contempt for his failure to

comply with the August order. Defendant gave notice of appeal from the October order on 2 November 2012.[2]

On 23 September 2013, Johanna filed motions to dismiss Defendant's appeals in COA13-689 and COA13-692. By orders entered 7 October 2013, those motions to dismiss were referred to this panel. Johanna seeks dismissal on grounds that Defendant's pursuit of these appeals "is an offense to the dignity of the Courts of the State of North Carolina" in light of Defendant's contemptuous behavior in the trial court and his "outrageous conduct" toward Johanna, the Moores, and their families, friends, and acquaintances. While we agree that Defendant's actions are among the most shocking and extreme that the members of this panel have witnessed in the many divorce-related cases they have reviewed, we must deny Johanna's motions to dismiss. Hateful, juvenile, and even contemptuous behavior by appellants toward other people and our State's trial courts is, unfortunately, not grounds for dismissal. Accordingly, we reach the merits of Defendant's appeals.

*Discussion*

---

[2] Defendant's two appeals were designated with separate COA numbers (COA13-689 for the appeal from the October order and COA13-692 for the appeal from the August order). Because the parties, facts, and issues raised in the two appeals are nearly identical, we address them together in this opinion.

Defendant argues that the trial court erred in entering the August order because it lacked (1) subject matter jurisdiction and (2) statutory authority pursuant to N.C. Gen. Stat. § 5A-21 to hold him in contempt. Defendant also argues that (3) the court erred in awarding attorneys' fees to Johanna in the August order. Finally, Defendant argues that (4) the court lacked jurisdiction to enter the October order. We disagree as to the August order, but agree as to the October order.

*I. Subject Matter Jurisdiction for Entry of the August Order*

Defendant first argues that the trial court lacked subject matter jurisdiction to enter the August order finding him in contempt of both the MDA and DVPO. Specifically, he contends the MDA (1) was not properly registered as a support order under Chapter 52C of the North Carolina General Statutes, the Uniform Interstate Family Support Act ("UIFSA"), (2) is not a "support order" at all, and (3) grants exclusive jurisdiction to the courts of Tennessee.

The issue of subject matter jurisdiction may be raised at any time, including for the first time on appeal. *Lemmerman v. A.T. Williams Oil Co.*, 318 N.C. 577, 580, 350 S.E.2d 83, 85, *reh'ing denied*, 318 N.C. 704, 351 S.E.2d 736 (1986). "A court

has jurisdiction over the subject matter if it has the power to hear and determine cases of the general class to which the action in question belongs." *Balcon, Inc. v. Sadler*, 36 N.C. App. 322, 324, 244 S.E.2d 164, 165 (1978).

We first address Defendant's arguments regarding the trial court's subject matter jurisdiction to hold him in contempt for violating the MDA. UIFSA provides that "[a] support order or an income-withholding order issued by a tribunal of another state may be registered in this State for enforcement." N.C. Gen. Stat. § 52C-6-601 (2013). Once a foreign support order is properly registered, it "is enforceable in the same manner and is subject to the same procedures as an order issued by a tribunal of this State." N.C. Gen. Stat. § 52C-6-603(b) (2013). UIFSA defines a "[s]upport order" as "a judgment, decree, or order, whether temporary, final, or subject to modification, for the benefit of a child, a spouse, or a former spouse, which provides for monetary support, health care, arrears, or reimbursement, and may include related costs and fees, interest, income withholding, attorneys' fees, and other relief." N.C. Gen. Stat. § 52C-1-101(21) (2013). Finally, UIFSA specifically grants subject matter jurisdiction over registered foreign support orders to our State's district courts. *See* N.C. Gen.

Stat. § 52C-1-102 (2013) ("The General Court of Justice, District Court Division is the court authorized to hear matters under this Act.").

Here, the MDA was filed on 23 September 2010 in the Chancery Court for Anderson County, Tennessee. On 27 April 2011, Johanna initiated proceedings to register the MDA as a support order under UIFSA. Defendant failed to contest registration of the MDA within twenty days, and accordingly, by operation of law, registration of the MDA was confirmed as of 17 May 2011. *See* N.C. Gen. Stat. § 52C-6-606.

Defendant asserts a series of inconsistent and meritless claims regarding the MDA. He first contends that while registration and confirmation of the MDA pursuant to UIFSA gave the trial court jurisdiction over any support provisions therein, the court lacked subject matter jurisdiction regarding paragraphs 11 and 32 of the MDA because those provisions do not explicitly discuss "support," but rather restrain Defendant from harassing Johanna or the Moores and require Defendant to relinquish any possible claims for alienation of affection or criminal conversation. Defendant cites no authority for the startling proposition that a court might have subject matter jurisdiction over certain paragraphs and provisions of a foreign

support order which has been properly registered and confirmed under UIFSA, but lack jurisdiction over other paragraphs and provisions. Nothing in UIFSA even suggests that a properly registered and confirmed foreign support order may only be enforced *in part* by our State's district courts. The relevant portions of UIFSA are contained in Chapter 52C, Article 6, Part 1, entitled "Registration and Enforcement of Support *Order*." (Emphasis added). The statutes quoted above all concern the registration and enforcement of *orders*, not paragraphs or provisions. This argument is overruled.

Defendant next contends that the MDA is not a "support order" at all because it contains no provisions for spousal support and uses the word "alimony" only in paragraph 2, entitled "Waiver." This meritless argument ignores the UIFSA definition of a "[s]upport order" as an order which benefits a spouse or former spouse by "provid[ing] for *monetary support*, *health care*, arrears, or reimbursement, *and may include* related costs and fees, interest, income withholding, attorneys' fees, and *other relief*." N.C. Gen. Stat. § 52C-1-101(21) (emphasis added). Paragraph 18 of the MDA requires Defendant to make monthly payments of $2,000 to Johanna for twelve months or until one of the parties' homes is sold. Although the MDA refers to

these payments as "[s]tructured payment[s]" rather than "alimony," they are plainly "monetary support." *Id.* Further, paragraph 26 of the MDA requires Defendant to keep Johanna on his employer-provided health insurance plan until Johanna is eligible for health insurance through her own employment, with Johanna reimbursing Defendant for the difference in cost due to her coverage. This provision concerns both "health care" and "reimbursement[.]" *Id.* Finally, UIFSA explicitly contemplates that "support orders . . . may include . . . other relief." *Id.* Thus, the MDA falls squarely within the statutory definition of a support order,[3] and accordingly, this argument is also overruled.

Defendant also asserts that the trial court lacked jurisdiction to enter the August order because the MDA explicitly grants jurisdiction to the courts of Tennessee and contains a choice of law provision stating that the laws of that state "shall govern." Defendant proceeds to argue that contract law principles dictate that these provisions deprived the North Carolina trial court of subject matter jurisdiction in this matter. Defendant appears utterly unable to grasp the fact

---

[3] Further, as noted above, Defendant had the opportunity to contest the registration of the MDA as a "support order" under UIFSA and elected not to do so.

that, once the MDA was properly registered and confirmed in North Carolina, it was transformed from a mere contract between the two parties to an *order* of our State's courts, explicitly enforceable as such. N.C. Gen. Stat. § 52C-6-603(b) (providing that a registered and confirmed foreign support order "is enforceable in the same manner and is subject to the same procedures *as an order issued by a tribunal of this State*") (emphasis added). We overrule this argument. The trial court had subject matter jurisdiction in this matter pursuant to the provisions of UIFSA.

*II. Authority to Find Contempt under Section 5A-21*

Defendant next argues that the trial court lacked the authority to hold him in civil contempt under N.C. Gen. Stat. § 5A-21 for failing to comply with the MDA and the DVPO. We disagree.

Section 5A-21 provides that "[f]ailure to comply with an order of a court is a continuing civil contempt . . . ." N.C. Gen. Stat. § 5A-21(a) (2013). "The purpose of civil contempt is not to punish; rather, its purpose is to use the court's power to impose fines or imprisonment as a method of coercing the defendant to comply with an order of the court." *Jolly v.*

*Wright*, 300 N.C. 83, 92, 265 S.E.2d 135, 142 (1980) (citation omitted), *overruled on other ground by McBride v. McBride*, 334 N.C. 124, 431 S.E.2d 14 (1993).  To hold a party in civil contempt, a court must find:

> (1) The order remains in force;
>
> (2) The purpose of the order may still be served by compliance with the order;
>
> (2a) The noncompliance by the person to whom the order is directed is willful; and
>
> (3) The person to whom the order is directed is able to comply with the order or is able to take reasonable measures that would enable the person to comply with the order.

N.C. Gen. Stat. § 5A-21(a).  "In order to find that a defendant acted willfully, the court must find not only failure to comply but that the defendant presently possesses the means to comply." *Miller v. Miller*, 153 N.C. App. 40, 50, 568 S.E.2d 914, 920 (2002) (citations and internal quotation marks omitted).  On appeal, our review of civil contempt orders "is limited to determining whether there is competent evidence to support the findings of fact and whether the findings support the conclusions of law."  *Id.* (citation and internal quotation marks omitted).

Defendant first contends that the MDA is nothing more than a contract and that its breach cannot result in a finding of

contempt. Having rejected the basis for this argument above, we reject Defendant's related assertion here. The MDA is a valid and enforceable court order, and the trial court was fully vested with authority to hold Defendant in contempt for his failure to comply therewith.

Defendant next contends that the contempt order contains no findings of fact that Defendant violated the DVPO first entered in December 2010 and renewed in December 2011 and May 2012. Specifically, Defendant observes that the DVPO prohibited him from having contact with Johanna whether "direct or indirect, by means such as telephone, personal contact, email, pager, gift-giving or telefacsimile machine." The DVPO also provided that Defendant "shall not assault, abuse, follow, harass (by telephone, visiting the home or workplace or other means), or interfere" with Johanna. Defendant asserts that this language only barred him from contacting or harassing Johanna herself such that his admitted contact with Johanna's friends, family, and associates was not a violation of the DVPO.

In overruling this meritless argument, we need only observe that the plain language of the DVPO bars Defendant from abusing or harassing Johanna "by telephone, visiting the home or workplace *or other means*[.]" Defendant does not dispute the

trial court's numerous findings of fact that, after entry of the DVPO, he left hateful and vulgar voicemail and email messages for Johanna's elderly parents, other family members, and friends. Defendant does not dispute the court's finding of fact 87, that Johanna had "been incredibly tormented by" those communications. In findings of fact 71-73, the court noted that, in his messages to Johanna's parents, Defendant explicitly and repeatedly stated that he was "on a mission" to compel various actions on Johanna's part by harassing her family and friends. Thus, Defendant's communications to Johanna's friends and family were intended to, and did, abuse and harass Johanna in violation of the DVPO. Further, findings of fact 61, 67, and 69-73 provide numerous examples of emails and voicemails left for Johanna's parents instructing them to "tell" Johanna to do various things. For example, Defendant asked Johanna's parents to tell Johanna she was "doing the wrong thing" and to "ask [Johanna] to do what is right and get out of my life." Defendant left a voicemail message telling Johanna's parents that he had sent emails to his and Johanna's children, Johanna's family members, and others, "trying to put pressure on [Johanna] to do the right thing. I'm going to keep doing that on a daily basis until I get something to happen[.]" As the court noted in

finding of fact 86, these communications were indirect contacts with Johanna specifically barred by the DVPO. Defendant's specious arguments regarding his violation of the DVPO are overruled.

Defendant also argues that the court erred in granting the Moores' motion for contempt as part of the August order, contending that the Moores were not third-party beneficiaries of the MDA, again citing contract law principles. We disagree.

The trial court found as fact that the Moores were third-party beneficiaries of the MDA. We review findings of fact in civil contempt orders only to determine whether there is competent evidence to support them. *Miller*, 153 N.C. App. at 50, 568 S.E.2d at 920 (citation omitted).

> North Carolina recognizes the right of a third-party ben[e]ficiary to sue for breach of a contract executed for his benefit. Ordinarily the determining factor as to the rights of a third-party beneficiary is the intention of the parties who actually made the contract. The real test is said to be whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts. It is not sufficient that the contract does benefit him if in fact it was not intended for his direct benefit.
>
> This Court has adopted the analysis of the Restatement (Second) of Contracts for purposes of determining whether a

beneficiary of an agreement made by others has a right of action on that agreement.

. . .

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) *the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance*.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 329 N.C. 646, 651, 407 S.E.2d 178, 181 (1991) (citations, internal quotation marks, and some brackets omitted; emphasis added). Johanna accepted an unequal division of the Marshalls' divisible property in favor of Defendant per the MDA specifically because she wanted Defendant to stop his campaign of harassment against her and the Moores. We can scarcely conceive of a better example of an intended beneficiary receiving "the benefit of a promised performance" than paragraph 32 of the MDA in which Defendant relinquishes any rights he may have against the Moores

under our State's alienation of affection and criminal conversation statutes and agrees not to harass the Moores or communicate with their known associates. The Moores are the *only* beneficiaries of this clause, and Johanna, the promissee, specially intended that they benefit from it. Thus, the trial court's finding of fact 12, that the Moores are third-party beneficiaries under the MDA, is supported by competent evidence. Defendant's arguments to the contrary are overruled.

*III. Award of Attorneys' Fees in August Order*

Defendant next argues that the court erred in the August order by awarding Johanna attorneys' fees to be paid by him. We disagree.

Paragraph 6 of the MDA specifies that a court "shall award reasonable attorneys' fees and suit expenses to the non-defaulting party" incurred as the result of the other party's noncompliance. As discussed herein, Defendant failed to comply with the MDA causing Johanna to incur significant attorneys' fees and costs. The trial court properly awarded attorneys' fees to Johanna under its authority to enforce the MDA as a court order. This argument is overruled.

*IV. Subject Matter Jurisdiction for Entry of the October Order*

Defendant also argues that the trial court lacked jurisdiction to enter the October order. We must agree.

"When an appeal is perfected[,] . . . it stays all further proceedings in the court below upon the judgment appealed from, or upon the matter embraced therein; but the court below may proceed upon any other matter included in the action and not affected by the judgment appealed from." N.C. Gen. Stat. § 1-294 (2013). Further, "[w]hile an appeal is not perfected until it is actually docketed in the appellate division, a proper perfection relates back to the time of the giving of the notice of appeal, rendering any later orders or proceedings upon the judgment appealed from void for want of jurisdiction." *Swilling v. Swilling*, 329 N.C. 219, 225, 404 S.E.2d 837, 841 (1991) (citation omitted).

Here, Defendant filed his notice of appeal from the August order on 18 September 2012, before both the 24 September 2012 hearing on Johanna's second motion for contempt and entry of the October order. "[T]hus, the trial court [wa]s without jurisdiction, pending the appeal, to punish the husband in contempt for failing to comply with the [order] appealed from and its findings and order to that effect are void." *Webb v. Webb*, 50 N.C. App. 677, 678, 274 S.E.2d 888, 889 (1981)

(citations omitted). Accordingly, we vacate the October order. Because the October order is vacated, we need not address Defendant's argument that the trial court erred in granting attorneys' fees to Johanna in that order.

AFFIRMED IN PART; VACATED IN PART.

Judges GEER and ERVIN concur.

Report per Rule 30(e).